360 A.2d 534.

SAINTS SAHAG AND MESROB ARMENIAN CHURCH *vs.* DIRECTOR OF PUBLIC WORKS FOR STATE OF RHODE ISLAND.

JULY 29, 1976.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This petition for assessment of damages resulting from a December 27, 1961 condemnation of certain property of the city of Providence within the area bound by Orms Street on the north and Smith Street on the south was heard by a Superior Court justice sitting without a jury. Following the trial the court ordered that judgment be entered for the petitioner in the amount of $50,000 plus interest. The respondent director has taken this appeal.

Today a pedestrian proceeding in an easterly direction along Smith Street can stop on the Smith Street overpass adjacent to the State House and the complex of state office buildings and gaze downward at an array of motor vehicles traveling north and south along interstate highway Route 95. Any pedestrian familiar with this neighborhood prior to the construction of Route 95 cannot help being impressed with the engineering virtuosity and ingenuity of those responsible for the 1961 transformation of this swatch of real estate into an interstate channel of commerce replete with overpasses, access roads, and entry and exit ramps. Such admiration, however, is a sentiment not universally shared. One dissenter is The Reverend Haik Donikian, the pastor at Saints Sahag and Mesrob Armenian Church.

Father Donikian, the church's treasurer, a member of the Parish Council, and a real estate expert all testified in Superior Court. Their testimony and exhibits together with the opinions offered by the real estate expert who

appeared on behalf of the director all relate to the church's claim for damages to its access rights. Hereinafter we shall refer to petitioner as Saint Sahag's.

Prior to the highway's construction Saint Sahag's was located within a triangle formed by Smith, Orms, and Davis Streets, the junction of Smith and Orms forming the triangle's apex and Davis serving as its base. More specifically, the church was located at the northwesterly corner of the intersection of Jefferson and Common Streets. Saint Sahag's is situated on a parcel of real estate which fronts on Jefferson almost 135 feet and runs to a depth along Common of just over 100 feet. The church first began to serve the needs of those of Armenian ancestry in 1914, at a time when little or no thought was given to the automotive needs of the parishioners. Father Donikian assumed his pastorate in 1958. Within the next few years an auditorium was built alongside and attached to the church. The church and auditorium structures occupy the bulk of the parcel of real estate.

In 1961 a parishioner driving to Saint Sahag's to attend religious services, Sunday School, or some social function at the auditorium could reach his destination by either Orms or Smith Street. Jefferson connected both highways. Common Street began at Davis Street and ran in a somewhat southwesterly direction past Jefferson and ended at Smith. The parishioners would park their automobiles on the nearby streets, including Jefferson, Common, Mulberry, Davis, portions of Liberty, and Orms Streets.

Sometime after the filing of the condemnation plat and the arrival of construction equipment in the Smith and Orms Street area, the swatch of nearby real estate became part of our nation's highway system. A comparison of the sketches which are appended to this opinion indicates that the 1961 condemnation took all of Liberty Street, portions of Jefferson, Mulberry, Davis, and

Orms Streets, and that part of Common Street which began at Davis and ended at the easterly side of Jefferson. Once the freeway and its appurtenances were complete, the traffic engineer of the city of Providence established a traffic pattern in the area whereby Jefferson and Common became one-way streets. Consequently, a motorist who wishes to arrive at Saint Sahag's entrance must make his final approach to the church from Orms Street, driving either westerly or easterly to Jefferson, turn south onto Jefferson, and west onto Common in order to exit.

Some 3 years after the filing of the condemnation plat[1] Saint Sahag's filed this petition for damages. The church's officials told the trial justice that once the freeway became operative and the Providence police began to enforce the traffic regulations, the parish's dues-paying membership began a slow but steady decline. In 1961 there were 831 dues-paying members; an incomplete 1971 canvass listed 337 dues-payers on the church's membership rolls. The representative of the Parish Council estimated that as a result of the 1961 taking some 215 on-street parking spaces that were once available to the parishioners disappeared. Father Donikian reported that this loss caused the parishioners on Sunday to double park on Orms Street. This, in turn, created a traffic hazard which caused the Providence police to order a "tow away." The pastor reported that many of those who paid the towing charges never returned to Saint Sahag's.

The church's real estate expert gave a precondemnation value of Saint Sahag's real estate of $400,000. He employed a reproduction cost less depreciation method of evaluating the buildings and then applied a value of $1 a square foot to the parcel's 13,500 square feet of land. He estimated that the post-condemnation value was

---

[1]The director has specifically waived any defense of the statute of limitations.

$200,000. He attributed the net loss in value of $200,000 to the loss of ingress and egress and the loss of on-street parking. In a quote that could cause some discussion in certain ecclesiastical circles, this expert reported that it was "* * * a known fact * * * that parishioners or people in attendance will park no greater than five to six hundred feet away from the front door of the church whether it is summertime or wintertime."

The treasurer described the church's efforts to provide substitute parking by its postcondemnation purchase and demolition of eleven houses in the adjoining area. The evidence indicates that the acquisition cost of this project amounted to $174,000.

The director's real estate expert agreed with the precondemnation figure of $400,000 presented by Saint Sahag's expert, but his postcondemnation value was $365,-000. The director's expert witness attributed the $35,000 damage figure strictly to the loss of on-street parking spaces. This witness stressed that there was no damage chargeable to the loss of egress or ingress because the state had installed an access road that begins at Smith Street and runs northerly along the easterly boundary of the freeway and parallel to what was Davis Street and ends where Orms and Davis Streets met before the 1961 taking. The motorist who wishes to approach Saint Sahag's from the east on Smith Street simply turns north on the access road, left on Orms Street, travels a short distance to Jefferson, and within seconds has arrived at his destination. This expert emphasized that the distance traveled over the access road to the church was practically the same as the precondemnation Smith Street approach.

The trial justice, in making his award of $50,000, emphasized that compensation could not be paid for the loss of on-street parking spaces or the new traffic pattern which sent one-way traffic down Jefferson Street and onto

Common Street. The only compensable damage, in his opinion, was the loss the church suffered as the owner of land abutting on Jefferson and Common Streets, more specifically, its right as an abutter to have both of these highways remain open for their entire length. We believe that the trial justice erroneously misconceived the extent of an abutter's right of access to a public highway that passes by his property.

The church's expert said that the "\* \* \* greater amount of [Saint Sahag's] damage was caused by the loss of ingress and egress by the laying of the bed of the freeway on the 27th of December, 1961." The trial justice remarked that since the expert had listed a loss of seven means of access to the church and because the trial justice had concluded that the loss had to be limited to the Jefferson and Common Streets routes of access, he took two-sevenths of the $200,000 damages, which amounted to approximately $57,000. Thereafter, the trial justice noted that since a portion of this expert's appraisal related to the loss of on-street parking, he would subtract an additional $7,000. Thus it was that the trial justice settled on the $50,000 award.

While we wonder how the trial justice could fractionalize the $57,000 figure in light of the expert's imprecise use of the phrase "greater amount of damage," we believe that the expert was just as imprecise when he spoke in such terms as the church's "loss of ingress and egress." The expert's reference to ingress and egress and the parishioner's desire to park within the shortest possible walking distance to the church of his choice are completely irrelevant to a proper adjudication of the property right upon which the church's claim actually rests. This right is properly described as "the right of access." This right, which we have said is nothing more than an easement appurtenant to the land abutting a public high-

way, not only affords the abutting owner with a reasonable opportunity to enter and leave his property through the use of the abutting way but also insures that once the abutter arrives on that way he can proceed from there to the general system of roadways. *Narciso* v. *State,* 114 R. I. 53, 64, 328 A.2d 107, 112-13 (1974) (concurring opinion) *citing Wolfe* v. *City of Providence,* 77 R. I. 192, 74 A.2d 843 (1950); *Newman* v. *Mayor of Newport,* 73 R. I. 385, 57 A.2d 173 (1948); *Gill* v. *Town Council,* 47 R. I. 425, 133 A. 806 (1926); *Johnston* v. *Old Colony R.R.,* 18 R. I. 642, 29 A. 594 (1894).

In *Narciso* we ruled that the abutter's right of access does not include the right that he or the general public must be able to travel to his property by the most direct route possible. *Narciso* v. *State, supra* at 62, 328 A.2d at 111. We also emphasized that an abutter has no right to the maintenance of the flow of traffic that passes by his property. *Id.* at 62, 328 A.2d at 111-12. Admittedly, in deference to the trial justice's ruling, there is language in *Johnston* v. *Old Colony R.R.* which suggests that an abutter has a right to insist that the adjacent roadway remain open to its full length. However, as was pointed out subsequently in *Sullivan* v. *Marcello,* 100 R. I. 241, 245-46, 214 A.2d 181, 184 (1965), the remarks once made by this court relative to an abutter having a "special right to have the whole highway open" were to be limited to the context of the factual considerations then before the court. In *Johnston* the owner had purchased her real estate in reliance upon a recorded plat which showed a highway open to its entire length. Compensation was due, the court observed, because a railroad company, acting under a statutory right of condemnation, had sealed off one end of the street and created a cul-de-sac. However, the court in *Johnston* specifically stressed that it was not dealing with a public highway or a state authority but a "pri-

742

vate street" completely obliterated by a corporation whose goal was to generate dividends for its stockholders.

In the late nineteenth century this court in *Gerhard* v. *Seekonk River Bridge Comm'rs*, 15 R. I. 334 (1886), set the tone for controversies such as presented by the case at bar. In *Gerhard* the court declared that an abutter on a public street obstructed under the authority of the state is not entitled to compensation if no part of the street in front of the abutter's property is occupied or obstructed, and if the abutter has access and egress to and from his property by other ways. *Id.* at 335. Compensation is only due in instances where there has been so substantial a diminution of the right of access that the owner does not have reasonable access to his property. *Aust* v. *Marcello*, 112 R. I. 381, 385, 310 A.2d 758, 760 (1973).

Applying these principles to the record before us, it is clear that while it may be a bit more inconvenient to reach Saint Sahag's front door, we find no substantial impairment of its access rights to either Jefferson or Common Streets. Its parishioners can reach the church with relative ease, and once services, Sunday School, or a social function has ended, they can leave via Jefferson or Common Street and be on the roadways leading to their homes within a minimum of time. We see absolutely no reason to award compensation in the case at bar. The church's problem falls squarely within the rule of *Narciso*. Although parishioners who insist on dropping off their passengers at the church's main entrance must take a more circuitous route to accomplish their goal, such circuity of travel is not compensable under *Narciso* because they still have reasonable access to the abutting ways and the general system of public highways.

The director's appeal is sustained, the judgment appealed from is vacated, and the cause is remanded to the

Superior Court with an order to enter judgment for the director.

Motion to reargue denied.

*John K. Najarian, Joseph G. Miller, (Co-counsel),* for petitioner.

*Stephen F. Mullen,* for respondent.

APPENDIX A

PRE-CONDEMNATION DIAGRAM

NOTE:

This diagram is not to scale. It is merely for the assistance of those reading this opinion.

- - - Condemnation Line
Route 95
FREEWAY

744

APPENDIX B

POST-CONDEMNATION
DIAGRAM

NOTE:

This diagram is not
to scale. It is
merely for the
assistance of those
reading this opinion